UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES FOR THE USE AND BENEFIT OF C & J OF CROWN POINT, L.L.C. | CIVIL ACTION |
| VERSUS | NO: 11-0857 |
| WAYNE A. SINGLETON, et al. | SECTION: "A" (2) |

## ORDER AND REASONS

Before the Court is a **Motion for Summary Judgment (Rec. Doc. 43)** filed by Defendant Great American Insurance Company ("Great American"). Also before the Court is a **Motion for Summary Judgment (Rec. Doc. 77)** filed by Defendant Arthur Wayne Singleton (erroneously referred to as "Wayne A. Singleton" in the Complaint and subsequent pleadings), d/b/a Singleton Enterprises ("Singleton"), adopting: the Memorandum in Support of Great American Insurance Company's Motion for Summary Judgment together with its affidavit of Joel D. Beach, affidavit of A. Wayne Singleton, and all exhibits attached thereto. Plaintiff C & J of Crown Point, L.L.C. and Plaintif in Intervention Crown Point Investments, L.L.C. (collectively hereinafter "C & J") oppose both motions. Both motions are before the Court on the briefs without oral argument[1]. For the reasons that follow, both motions are **DENIED**.

## I. BACKGROUND

This matter arises out of a balance allegedly owing on a subcontract for maritime dredging

---

[1] The Court notes that Great American filed a request for oral argument "to assist the Court in further explaining the applicable law and clarifying the facts." (Rec. Doc. 45). The Court, after a review of the pleadings, is not persuaded that oral argument would be helpful.

1

services. On or about April 13, 2009, Defendant Arthur Wayne Singleton, d/b/a Singleton Enterprises, entered into a contract with the National Resources Conservation Service ("NRCS") to perform work in connection with the Hanson Marsh Project ("Project"), pursuant to Contract No. AG-7217-C-09-0010 and/or AG-7217-09-0016 ("Prime Contract"), in exchange for payment in the amount of $486,200. (Rec. Doc. 11 at 2). On or about April 13, 2009, Singleton obtained a Miller Act payment bond from Defendant Great American as required by the NRCS. (Rec. Doc. 5 at 2-3). On or about April 16, 2009, Singleton allegedly subcontracted with Tri-Native Contractors, Inc. ("Tri-Native") to perform dredging and other services in connection with the Prime Contract with NRCS. (Rec. Doc. 5 at 3). Specifically, per the affidavit of A. Wayne Singleton, under the Prime Contract, Singleton was to dredge approximately 50,000 cubic yards of marsh on the Project. (Rec. Doc. 43-4 at 2).

  Mr. Singleton claims that Tri-Native submitted a proposal to complete dredging work under the Prime Contract on or about March 11, 2009. (Rec. Doc. 43-4 at 2, 10). A little over one month later, by letter dated April 16, 2009, Singleton wrote to Tri-Native accepting Tri-Native's purported proposal to furnish "all labor, material, equipment and supervision necessary to complete all Mobilization and Demobilization, Excavation, Earthfill [sic], Identification Markers or Plaques and Contractor Quality Control work" on the Project. (Rec. Doc. 43-4 at 11). Singleton, per this letter, required that Tri-Native provide a certificate of insurance and a signed Standard Form 1413 Statement and Acknowledgment, among other appropriate submissions. (Rec. Doc. 43-4 at 12). Mr. Singleton claims that Tri-Native replied with the signed Statement and Acknowledgment Form 1413, along with a certificate of insurance, a dredging plan, and a safety plan[2].(Red. Doc. 43-4 at 2, 14-16). The Court notes that in his deposition of July 13, 2012, Mr. Joseph Dardar, appearing in a

---

[2] A copy of the purported safety plan was not submitted to the Court.

representative capacity on behalf of Tri-Native, testified that the signature affixed to the Statement and Acknowledgment Form 1413 was not his and was in fact a forgery. (Rec. Doc. 65-2 at 22-25).

Whether the aforementioned documents were sent, received, signed or forged, in August of 2009, Tri-Native began to perform work on the Project under the Prime Contract. (Rec. Doc. 43-4 at 2). Mr. Singleton claims that he notified Tri-Native by letter dated November 20, 2009 however, that Tri-Native's failure to provide a dredge on the Project was causing Singleton delays. (Rec. Doc. 43-4 at 3, 20-21). Mr. Singleton claims that he then sent a follow-up letter on November 24, 2009, notifying Tri-Native that the subcontract of April 16, 2009 was in default for failure to timely provide a dredge, among other deficiencies. (Rec. Doc. 43-4 at 3, 22-25). This correspondence provided a brief period for Tri-Native to cure the default. (Rec. Doc. 43-4 at 3, 22-25). Shortly thereafter however, Mr. Singleton by letter dated December 1, 2009 notified Tri-Native that Singleton was terminating the subcontract for default. (Rec. Doc. 43-4 at 3-4, 26-27).

Some three weeks later, NRCS, by letter dated December 21, 2009, notified Singleton that it was in jeopardy of having the Prime Contract terminated for default and that Singleton had ten days to cure certain deficiencies. (Rec. Doc. 28-29). One of the reasons listed by NRCS as endangering performance under the Prime Contract was Singleton's failure to begin dredging operations. (Rec. Doc. 43-4 at 28). Three weeks after this correspondence, by letter dated January 11, 2010, Singleton was terminated from the Prime Contract by the NRCS for its "failure to prosecute work diligently (mobilization and completion of dredging operations) and ensure its completion within the time specified by the contract and [its] failure to address the Cure Notice sent to [it] on December 22 [sic], 2009." (Rec. Doc. 43-4 at 30-31).

Per Mr. Singleton's affidavit, in an effort to be reinstated on the Project, on or about February 4, 2010, Mr. Singleton contacted Mr. Dardar to ascertain whether Tri-Native was interested

in completing the work under its purported subcontract. (Rec. Doc. 43-4 at 4). Mr. Singleton alleges that, "Mr. Dardar told me that Tri Native [sic] still wanted to perform and complete its 'original subcontract' and that it could possible [sic] mobilize and be ready to start pumping on the Project on February 25, 2010, but it would more likely be able to mobilize on March 5, [2010]." (Rec. Doc. 43-4 at 4). In support of this allegation, Mr. Singleton points to a letter he claims Singleton sent to Tri-Native on February 16, 2010, wherein Tri-Native was reinstated under the "original subcontract." (Rec. Doc. 43-4 at 32-33).

After meeting with Great American representative Joel Beach and various NRCS representatives on February 9, 2010, Singleton was subsequently reinstated under the Prime Contract on February 15, 2010. (Rec. Doc. 43-4 at 5, 34-36). Per the affidavit of Mr. Singleton, Singleton thereafter reinstated Tri-Native's subcontract on February 16, 2010. (Rec. Doc. 34-4 at 5). Mr. Singleton claims that he relied on assertions made by Joseph Dardar that Tri-Native was interested in reinstating its subcontract and finishing the dredging work when Mr. Singleton met to reinstate the Prime Contract. (Rec. Doc. 43-4 at 4). In Singleton's aforementioned February 16, 2010 letter to Tri-Native, Singleton stated that all remaining work under the original subcontract dated April 16, 2009, was to be completed by May 15, 2010, and that if any of the terms and conditions of the original subcontract were not acceptable, that Singleton was to be notified, "by FAX and Certified Mail within Seven (7) calendar days from the date of this contract." (Rec. Doc. 43-4 at 5, 32-33). Mr. Singleton claims that he never received a response to this correspondence. (Rec. Doc. 43-4 at 5). Mr. Singleton has testified that at some point subsequent to Singleton's claimed reinstatement of Tri-Native's subcontract, he was notified that C & J "bought out" Tri-Native. (Rec. Doc. 43-4 at 6).

On or about March 18, 2010, per Mr. Singleton's affidavit, the dredge Crown Point was

4

finally mobilized on the Project. (Rec. Doc. 43-4 at 6). As supported by email correspondence dated April 7, 2010, sent from Vicki Supler of NRCS to Mr. Singleton, dredging work did not actually begin however until April 7, 2010, and when it did begin, it started at the middle of the Project area, in derogation of the specifications provided for in the Prime Contract. (Rec. Doc. 43-4 at 37-38). Per Mr. Singleton's affidavit, on May 4, 2010, "the NRCS contracting office, Vicki Supler, COTR, Warren Blanchard, Singleton Superintendent Jerry Bryan, Great American representative Joel Beach and 'Shannon Dardar, Tri-Native'" met at the Project site to discuss the status of the project. (Rec. Doc. 43-4 at 6). Mr. Singleton claims that "[t]he NRCS contracting officer noted deficiencies in the dredging work and specifically discussed those deficiencies with Shannon Dardar." (Rec. Doc. 43-4 at 6). These deficiencies are confirmed in a letter dated May 10, 2010 from Vicki Supler of NRCS to Mr. Singleton. (Rec. Doc. 43-4 at 39). Ultimately, after sending a cure letter dated May 10, 2010 and addressed to both Joe Dardar of Tri-Native and Cai Ngo of C & J of Crown Point, Singleton opted to once again terminate the dredging subcontract for default. (Rec. Doc. 43-4 at 7, 42-47). Per Mr. Singleton's affidavit, on May 13, 2010, after terminating the dredging subcontract, he commissioned an as-built survey to determine how much material had been dredged from the Project up to that point. (Rec. Doc. 43-4 at 7). The results of this survey determined that approximately 3,616.5 cubic yards of material had been dredged as of May 30, 2010. (Rec. Doc. 43-4 at 7, 48-49).

On or about June 15, 2010, Singleton itself was terminated from the Prime Contract a second time by NRCS. (Rec. Doc. 12 at 3) (Rec. Doc. 43-4 at 54-55). At termination there was a balance of $389,910 remaining on the Prime Contract. (Rec. Doc. 12 at 3). In accordance with its obligations under the performance bond for the Project, Great American tendered Coastal Dredging Company, Inc. ("Coastal") to the NRCS to complete work under the Prime Contract on the Project on November 4, 2010. (Rec. Doc. 43-5 at 4, 14-18). Shortly thereafter, Coastal mobilized on the

Project and timely completed the work outstanding under the Prime Contract within sixty (60) days. (Rec. Doc. 43-5 at 4). NRCS accepted Coastal's work on the Project and paid the $389,910 remainder from the Singleton Prime Contract. (Rec. Doc. 43-5 at 4). Great American paid the balance[3] of Coastal's fee and was later reimbursed by Singleton the full amount of $120,688.03. (Rec. Doc. 43-5 at 4). Additionally, NRCS has demanded payment of $84,788.13 to reimburse it for the excess costs of administering Coastal's work. (Rec. Doc. 43-5 at 4-5).

On or about June 30, 2010, counsel for C & J sent Singleton an invoice for $354,400 for work C & J allegedly completed on the Project. (Rec. Doc. 43-4 at 7, 50-53). On April 14, 2011, C & J filed the instant action to recover the $354,400 it alleges Singleton owes under theories of breach of contract and *quantum meruit*, and against Great American under its alleged obligations pursuant to the Miller Act, 40 U.S.C. § 3133. (Rec. Doc. 1). On July 14, 2011, Singleton filed a counterclaim against C & J and a third-party complaint against Tri-Native alleging breach of contract and consequential losses. (Rec. Docs. 11 and 12). On October 6, 2011, Tri-Native responded to Singleton's third-party complaint and filed a counterclaim, asserting, "[t]o the extent Singleton maintains that his contract was with Tri-Native and not C & J of Crown Point, L.L.C., which is denied, then to that extent Tri-Native adopts the complaint of C & J and alleges breach of contract by Singleton and demands damages in the same amount as C & J of Crown Point, L.L.C." (Rec. Doc. 26 at 7-8).

In anticipation of trial, Great American and Singleton filed the instant motions for summary judgment. (Rec. Doc. 43 & 77). For the following reasons, the instant motions are denied.

---

[3]Coastal bid completion of the project at $538,175. (Rec. Doc. 43-5 at 4, 14-18). The Court notes a discrepancy between the amount bid and the amount allegedly paid. Per Defendants' submissions, NRCS paid Coastal $389,910 and Great American paid Coastal $120,688.03 which total $510,598.03.

A three-day non-jury trial in this matter is set for Wednesday, March 20, 2013 at 9:30 a.m.

## II. STANDARD OF REVIEW

Summary Judgment is appropriate only if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed. R. Civ. P 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (1993)).

## III. DISCUSSION

In its motion for summary judgement, Great American argues that there is no genuine issue as to any material fact because C & J cannot prove that it had a subcontract with Singleton, whether oral or written; because C & J cannot prove its unjust enrichment claim, given that Singleton was impoverished rather than enriched by the contractual relationship with C & J if one existed; and because Great American, as Singleton's surety, is entitled under the Miller Act to assert the defenses

of its principal, Singleton. (Rec. Doc. 43-1 at 20). The Court, having reviewed the motions before it, the relevant statutes, and the relevant case law, and having determined that though filed as two separate motions, the two instant motions for summary judgement before it are essentially identical, will analyze the motions in tandem. Accordingly, the following analysis is applicable to both motions disposed of in this order.

**A. Plaintiff's Breach of Contract Claim**

Great American argues first that no written subcontract exists between Singleton and C & J. This was admitted by Mr. Joseph Dardar, in his representative capacity on behalf of C & J, in his July 20, 2012 deposition. (Rec. Doc. 43-8 at 2). Therefore, in order for C & J to maintain its breach of contract claim, it must set forth evidence establishing the existence of an oral contract. Under Louisiana law, "[a] party claiming the existence of a contract has the burden of proving that the contract was perfected between himself and his opponent." *Pennington Constr., Inc. v. R A Eagle Corp.*, 652 So.2d 637, 639 (La. App. 1 Cir. 1995) (*citing* La. C.C. art. 1831). Further, in Louisiana, an oral contract that exceeds five hundred dollars in value, must be proven by one credible witness and corroborating evidence. La. C.C. art. 1846. "To meet the burden of proof of an oral contract by a witness and other corroborating circumstances, a party may serve as his own witness and the 'other corroborating circumstances' may be general and need not prove every detail of the plaintiff's case." *Pennington.*, 652 So.2d at 639 (citations omitted). "However, the corroborating circumstances that are required must come from a source *other than the plaintiff*." *Id.* (emphasis added).

Great American argues that C & J cannot prove the existence of an oral subcontract, because any contract that was in existence was between Tri-Native and Singleton, rather than between C & J and Singleton. Great American asserts that "C&J must come forward with specific facts, supported

by admissible evidence, to prove that an oral subcontract exists between Singleton and C&J. C&J will be unable to do this, so C&J's claim must be dismissed." (Rec. Doc. 43-1 at 17). Great American adds that C&J was not the proper party to bring a claim under the purported subcontract for dredging services on Tri-Native's behalf because "C&J was never assigned any rights under the Tri Native [sic] subcontract which was reinstated on April 16, 2010." (Rec. Doc. 43-1 at 17). And, "[w]ithout either proof of a contract or an assignment of a claim under the contract, C&J's breach of contract claim should be dismissed." (Rec. Doc. 43-1 at 18).

Great American, in an effort to support its motion to dismiss all claims brought against Singleton, argues further that because "Tri Native has not [yet] filed any claim against Great American ... [i]t is too late now for Tri Native to amend its pleadings ... as Tri Native's [sic] claim would be prescribed under the clear terms of the Miller Act." (Rec. Doc. 43-1 at 18).

To summarize, Great American urges first that there is no evidence of a subcontract existing between Singleton and C & J. Second, while there was a subcontract between Tri-Native and C & J, because C & J cannot prove an assignment of claim, it has no right to assert a claim on Tri-Native's behalf. And third, if Tri-Native, at this advanced stage of litigation, wished to assert a claim on its own behalf under the purported subcontract, it would be precluded from doing so as the claim would be untimely under the Miller Act.

C & J counters that, under the Miller Act, it does not have to prove the existence of a contract since the Miller Act affords relief to material suppliers and laborers as well as subcontractors. (Rec. Doc. 65 at passim). C & J argues that:

> The distinction between a "subcontractor" and a "materialman" turns on the substantiality and importance of the relationship between the middle party and the prime contractor. Only a middle party who has taken responsibility for a large and definable part of the construction project is a "subcontractor." Otherwise, he is a "materialman."

(Rec. Doc. 65 at 6) (citing *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102 (1944); *F.D. Rich Co., Inc. v. United States*, 417 U.S. 116 (1974); *Aetna Casualty & Surety Co. v. United States*, 382 F.2d 615, 617 (5th Cir. 1967)). C & J continues:

> There are some interesting permutations of fact for trial: whether Joseph Dardar, individually, was a Miller Act subcontractor or whether Tri-Native Contractors was. This determination may affect the outcome of the case at trial because at the time that C & J of Crown Point undertook performance, Joseph Dardar was employed in his individual capacity as Chief Engineer of C & J of Crown Point.

(Rec. Doc. 65 at 6-7). Additionally, C & J argues:

> To state a valid Miller Act claim, a plaintiff must prove two elements: (1) it has "furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131"; and (2) it "has not been paid in full within 90 days."

(Rec. Doc. 65 at 18) (*citing* 40 U.S.C. § 3133(b)(1)). Elsewhere in its pleading, C & J describes the work it allegedly provided stating:

> The undisputed evidence shows that C & J of Crown Point mobilized a dredge and barges with dredge pipe on the site and moved earth to cap dykes on the containment area, which was already under construction near Houma, Louisiana. C & J of Crown Point supplied a crew of seamen to operate the dredge. The crew and the onsite supervisor used the rented marsh buggy which was rented to rebuild the containment dykes after dewatering [sic] as well as to move the dredge pipe. The dredge and marsh buggy took gasoline and oil to operate. The operators of the equipment would keep records of the use of the equipment and forward them to the site supervisor. Mule barges were then driven to the containment site and weir boxes to ascertain if any material was accumulating. If there was hauling to be done, barges were on site ready to use. In the course of their operations it was sometimes necessary fo the dredge to shut down for commercial navigation or for repairs and for breakdowns which occurred. This was done at the instance [sic] and for the benefit of the prime contractor in connection with their contract at Houma Louisiana. The entire amount of dredging labor, material, pipe, fuel and oil was obtained from the use [sic] plaintiff, C & J of Crown Point, L.L.C.

(Rec. Doc. 65 at 17-18).

After a review of the voluminous record before it, the Court finds that there are genuine issues of material fact which preclude granting the instant motions for summary judgment. Great

American is correct that C & J must come forward with one credible witness and other independent corroborating evidence to support the existence of an oral subcontract. Though not specifically pleaded by C & J, after a review of the record, the Court finds that the cure letter dated May 10, 2010, and addressed to both Joe Dardar of Tri-Native and Cai Ngo of C & J of Crown Point, *sent by Singleton* prior to termination of the alleged subcontract a second time, is precisely the type of independent corroborating evidence contemplated under article 1846 of the Louisiana Civil Code. *See* (Rec. Doc. 43-4 at 7, 42-47). In combination with the sworn affidavits and deposition testimony of Jerry Bryan[4], Joseph Dardar, Shannon Dardar, Cai Ngo, and Joe Pham, all attesting to facts that may support the existence of an oral subcontract, C & J has met its burden of introducing evidence that could lead a reasonable finder of fact to conclude that an oral subcontract between Singleton and C & J was perfected. Ultimately, a determination of whether an oral subcontract existed and the parties to, and terms of, that subcontract if it existed, are questions of fact reserved for the trier of fact. Further, relief under the Miller Act, as pleaded by C & J and briefly outlined above, turns ultimately on findings of fact. The Court again finds that, given the record before it, a finder of fact could reasonably conclude, if not a subcontractor, C & J was nonetheless a supplier of material to the Prime Contractor, Singleton, which may entitle it to relief under the Miller Act. Accordingly, the Court finds that genuine issues of material fact exist as to C & J's breach of contract claim.

---

[4]The Court notes that Great American in its Reply Memorandum (Rec. Doc. 74) has advanced the argument that portions of the Declaration of Jerry D. Bryan (Rec. Doc. 65-4) should be stricken under Federal Rule of Evidence 401. The Court finds that this is not the proper vehicle for asserting these arguments and accordingly will not address them in this Order.
   The Court notes further that Great American in its Reply Memorandum (Rec. Doc. 74) has also advanced the argument that portions of C & J's Opposition (Rec. Doc. 65) "must be stricken from the record pursuant to the Federal Rules of Evidence." (Rec. Doc. 74 at 7-8). However, this is not the proper vehicle for asserting these arguments. Accordingly, the Court suggests that Great American file separate motions, should it desire judicial review.
   The Court notes further that it would have reached the same result, dismissing the instant motions for summary judgment, even if portions of the pleadings were restricted as requested.

### B. Plaintiff's Unjust Enrichment/*Quantum Meruit* Claim

In its complaint, C & J has brought a claim for *quantum meruit*. For the sake of clarity, as noted in *Baker v. Maclay Properties*, 648 So.2d 888, 897 (La. 1995) (citing *Morphy, Makofsky & Masson, Inc. v. Canal Place*, 538 So.2d 569 (La. 1989)), the distinction between the concept of *quantum meruit* at common law and the concept of *quantum meruit* at civil law is deserving of a brief discussion. "As a civilian concept, quantum meruit refers to the measure of compensation or price *unstated in a contract*." *Id.* (emphasis added). Accordingly, under the civilian concept of *quantum meruit*, there can be no recovery if there is no contract. *See id.* That is, the existence of the contract itself, is a necessary predicate for recovery. Therefore, the proposition advanced by C & J, that recovery is available under *quantum meruit* in the alternative to recovery under breach of contract, is technically improper under Louisiana law. C & J's error is deserving of little criticism however, for as the court in *Baker* noted, "[u]nfortunately for the purity of the civilian concept of quantum meruit, the term is used interchangeably with the common law substantive law claim geared in equity also known as quantum meruit." *Id.* Though improperly styled in its Complaint, C & J's argument that even if a subcontract between C & J and Singleton is not proven, C & J is nonetheless entitled to compensation for the work it provided and Singleton accepted, is cognizable in civil law under the theory of *actio de in rem verso*, or unjust enrichment. Accordingly, the Court will analyze this claim under the Louisiana law of unjust enrichment.

In Louisiana:

> The five requirements for a showing of unjust enrichment, or *actio de in rem verso*, are: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff.

*Baker*, 648 So.2d at 897 (citations omitted).

>   Great American asserts that:
>
>> C&J cannot prove that Singleton was enriched because the exact opposite is true – Singleton incurred expenses in the amount of $120,688.03 to redo C&J's work because C&J did not perform the Project in accordance with the plans and specifications. The plans and specifications stated that the dredging was supposed to begin at the southern edge of the containment area to build a terrace to contain the dredge material. C&J began the work in the middle of the waterway, causing Singleton to hire Coastal to redo and complete C&J's work.

(Rec. Doc. 43-1 at 19). Great American continues that "there is certainly a justification for Singleton's nonpayment to C&J for its minuscule amount of work. Because Singleton was required to hire Coastal to fix C&J's work, Singleton was justified in not paying..." (Rec. Doc. 43-1 at 20). Therefore, according to Great American, "[b]ecause C&J will be unable to prove at least two elements of Louisiana's five-factor unjust enrichment [test], C&J's claim for unjust enrichment must be dismissed." (Rec. Doc. 143-1 at 20).

In response to the argument asserted by Great American, C & J argues that though "Great American asserts that the work was *defective* ...Singleton did not allege this to the Department of Agriculture in the appeal of his default termination by the NCRS [sic]..." (Rec. Doc. 65 at 13)(emphasis added). Further:

> In Great American's uncontested issue of fact number 7, the defendant alleges that, "In June 2010, Singleton was defaulted by the NRCS for failure to prosecute the dredging work *diligently*." C & J of Crown Point and Crown Point Investments have a factual basis to dispute this conclusory statement of fact because Jerry Bryan, Singleton's on-site supervisor states in his declaration that delays occurred due to mechanical problems with respect to the dredge, local traffic navigation in the waterway, and water levels.
>
> *  *  *
>
> ...C & J of Crown Point directs the court to Singleton's admission that the issue was "non-performance" and that Coastal Dredging was hired to complete the Project, not hired to fix, repair, or correct any work performed by Plaintiff. [Great American] has presented no evidence that the work of C & J of Crown Point was defective. Regardless, the determination of the defective quality of Crown Point's dredging and to quantify an

13

amount of work are an issue [sic] to be determined at trial.

(Rec. Doc. 65 at 14 - 15) (emphasis added). C & J adds that, "Great American has failed to consider the comparative fault of Singleton in terminating Plaintiff on or about May 5, 2010, by having Jerry Bryan issue a stop work order prior to the completion date." (Rec. Doc. 65 at22). Lastly, C & J offers that:

> Joseph Dardar testified that the reason that the project was uncompleted was that Wayne Singleton failed to pay progress payments to C & J of Crown Point for its mobilization. Plaintiff contends that the only issue *vis-a-vis* progress on the job was the quantity of dredging that had taken place in four weeks. Once again, this is a material issue of fact for trial and Great American's assertions otherwise should be discounted.

(Rec. Doc. 65 at 24) (footnote omitted).

Alternatively, C & J counters that, "where Singleton Enterprises accepted the benefits of plaintiff's equipment, the law implies a duty of Singleton Enterprises to pay for such use because the labor and material was supplied for the use of the United States." (Rec. Doc. 65 at 16). C & J adds that "an implied contract[5] may be inferred from the conduct of the parties."(Rec. Doc. 65 at 17). C & J supports its implied contract argument by describing the labor and material it allegedly supplied, *see supra*, and by arguing:

> Implied contracts arise by legal inference and upon principles of reason and justice from certain facts, or where there is circumstantial evidence showing that the parties intended to make a contract. Where one performs for another a useful service of a character that is usually charged for, and such service is rendered with the knowledge and approval of the recipient who either expresses no dissent or avails himself of the service rendered, the law raises an implied promise on the part of the recipient to pay the reasonable value of such service.

(Rec. Doc. 65 at 17) (citing 66 Am.Jur. 2d Restitution § 24).

---

[5]The Court finds that though C & J initially pleaded in the alternative an unjust enrichment claim, and has here in its opposition asserted an "implied contract" claim, given the original pleading and the arguments advanced in support of this claim, it is essentially a claim for unjust enrichment and accordingly is included in this subsection.

The Court concludes that there are genuine issues of material fact as to whether C & J is entitled to alternative relief should the fact-finder determine that no subcontract was in existence when C & J performed work on the Project. Accordingly, the Court denies the motions for summary judgment before it.

## IV. CONCLUSION

Accordingly, and for the foregoing reasons;

**IT IS HEREBY ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 43)** filed by Defendant Great American Insurance Company ("Great American") and the **Motion for Summary Judgment (Rec. Doc. 77)** filed by Defendant Arthur Wayne Singleton, d/b/a Singleton Enterprises, are **DENIED**.

This 3rd day of December, 2012.

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE